Mr. Justice Hagner
delivered the opinion of the court:
This case has had a troublous history. It was first tried in 1883, before Justice MacArthur, and a verdict for $8,000 was rendered for the plaintiff, after a hearing of the evidence on both sides. Ón appeal this was reversed by the General Term, Chief Justice Carrier and Justices Wylie and James sitting, and the case was remanded to the special term in 1885. In November of that year it came on for trial before Justice Merrick, who upon the statement by plaintiff’s counsel of what he expected to prove, directed the jury to render a verdict for the defendant, without hearing the plaintiff’s testimony. On appeal this ruling was reversed by the General Te#m, Chief Justice Carrier and Justices Cox and James sitting, and the case was again re-, manded for trial in May, 1886.
In December 1887, it was again heard in the special term before Justice Cox, and upon a hearing of the testimony on both' sides, a verdict for $10,000 was rendered for the plaintiff. This was set aside by the presiding justice in January 1888, and a new trial ordered. No appeal was taken from this ruling, and the case was commenced again in the special term, before Justice Merrick. After the evidence for the plaintiff was closed, the presiding justice directed a verdict to be entered for the defendant, and the present, the third appeal, was taken from that order.
The plaintiff sued to recover for damages sustained while alighting from a passenger train of the defendant company, through the alleged negligence of its officers and servants. The facts relied upon by the plaintiff, necessary to an understanding of his claim, may be thus abridged from the testimony in the record:
ft appears he was a man thirty-eight years of age at the time of the accident and was then engaged near Gaithersburg, Maryland, in the service of the railroad company; he came to Washington on the evening before the accident, *348 and started back for his home next morning; he reached ' the depot shortly before 8 o’clock, and bought a ticket for Gaithersburg. As he went through the gate leading to the trains, he received instructions from the gate-keeper as to .the location of the train he should take, and got upon a smoking-car in that train, where he remained until an employee of the company dressed in overalls, whom he supposed to be a laborer, entered the car and told plaintiff that car had been detached: plaintiff told him he wanted to go to Gaithersburg, and asked him where the train was, and he pointed it out on the right of the platform: he got aboard that train, just as it was moving off, and after it had gone a short distance outside the depot, while he was still upon the platform, an official came out of the car, dressed in the uniform of the company. The plaintiff testified he supposed him to be the conductor, and asked him. if that train was going to Gaithersburg. He replied: “ No, it is going to Baltimore, and if ,you don’t want to go to Baltimore, you hadl. better get off.” “ Acting under these instructions ” (he thinking it was safe, I suppose) “ I got off, with the result of breaking my arm by falling on my elbow.” When asked how the accident occurred, plaintiff says: “The best of my recollection is that as. I stepped off, the engineer gave the engine a little more steam, and threw me off my balance”; and that after the fall he remembers nothing. At the time of the accident, the cars were going at the rate of two and a half or three miles an hour.
The plaintiff was taken to Providence Hospital, where his arm was amputated.
On cross-examination, he testified the party whom he took to be the conductor did not address him until he asked him if that train was going to Gaithersburg; that he got off immediately, though he did not know whether it was the very second or not; he took his time; he did not ask him to stop the car and let him off; that he thought it was safe, and therefore got off; that the conductor thought so too; that he jumped from the right hand side of the car, as he be *349 lieved, in the direction the train was moving; that there was no embankment at the place he jumped from the train; that he had gotten off of moving trains before, but was not in the habit of doing so; and that he had been a freight agent for several years for a railroad company in Virginia; that he did not ask the conductor to stop the train, because he supposed the conductor thought it wasn’t necessary to stop it, and he thought he could get off in safety without stopping; that he did not see any peril in jumping off; there was no apparent danger to him, and he thought it was safe, as the train was going slowly; that he got off because he didn’t want to go to Baltimore, but wanted to go to Gaithersburg; that he understood he would be taken to Baltimore if he did not get off then, because the conductor didn’t stop; and the train continued in motion, and if he had stayed on he would have been carried; to Baltimore, while he had business at Gaithersburg. 7
In the progress of the examination several exceptions were taken by the plaintiff to rulings of the court upon points of evidence.
The remaining evidence in the case was that of Dr. Elliott, the surgeon who performed the operation, as to the serious character of the injury.
The plaintiff having closed his case, on motion of defendant’s counsel, the court directed the jury to return' a verdict for the defendant, to which ruling of the court the plaintiff by his counsel excepted.
It was contended by defendant’s counsel that in the former stage of the case the court in General Term had made rulings which were fatal to the right of the plaintiff to recover in this action. We have been at pains to seek for such ruling, but without success. The opinion of the General Term on the appeal from Justice MacArthur’s rulings, said to have been delivered' by Justice James,' has disappeared from the papers. We have caused search to be made for it by the clerk, without success, and as it was never printed we have no information as to its terms that can con *350 trol us. On examination we find the reasons assigned for a new trial addressed to Justice MacArthur are in the familiar form — that the verdict was against the evidence, and the weight of evidence; that the damages were excessive; that the jury disregarded the court’s instructions, and that the instructions were incorrect. No mention was made of-the main point presented here.
On the second appeal' the reported opinion of Chief Justice Cartter embodies no such statement; but in one of the closing paragraphs the language of the court was rather to the contrary. The Chief Justice says:
“We think that within the limitations of the case, as stated by counsel, a case might be made.” 5 Mackey, 14.
Evidently, if the supposed rulings had been made by the General Term at either trial, there would have been an end of the case long since.
The second exception was taken to the refusal of the court to permit a question to be put to the plaintiff which it held should have been asked in chief. This ruling cannot be 'considered here, as such a decision is a matter of discretion with the trial justice, and is not the subject of review.
The first and third exceptions present practically the same question. It appears from the first exception that the plaintiff was asked, “ When you went to the depot that morning, what appliances, what means, were in the depot that would suggest to .passengers the train they were to take?” and from the third exception, that the question asked of Mr. Tinker was, “ State, if you please, the means passengers had of knowing what train to take for their different places of destination.”
No reason was assigned by the defendant why the testimony was not admissible, and, under such circumstances, if it were admissible for any purpose, it was error to exclude it. Conner et al. vs. Mount Vernon Company, 25 Maryland, 55.
Although the point may appear of minor importance in the present stage of the case, we consider it proper to say *351 we think the evidence should have been admitted. The plaintiff had testified he had applied in turn to two employees of the company for information as to the train he' ought to take. If there had been displayed in proper places in the depot, legible signs indicating the destination of the several trains, there would have been little, or perhaps no, excuse for his making the inquiry, or for his claim that he relied upon their statements; while proof of the absence of such proper appliances would tend to support the need of his inquiries, and the probability of his reliance upon the replies he received. This fact -he was entitled to present to the jury, as tending to show negligence on the part of the defendant. There has been doubtless, a decided improvement in these particulars in many stations; but in the absence of such needful aids there cannot be a more bewildering place to one unaccustomed to traveling than a great depot filled with different trains and crowded with passengers leaving and arriving. There should, of course, be officials enough present to give answers, not grudgingly or of necessity, to those needing information; but the presence of sign boards would be a very great help to those who have a right to be relieved of such anxiety in the shortest attainable time.
The prominent question in the case is whether the court’s action in withdrawing the case from the jury at the close of the plaintiff’s testimony, was proper under the circumstances.
The power and right of a court to take such' a course in a proper case cannot be questioned. The only inquiry before us is whether that course was justified under the circumstances in the case at bar. The more recent statements of the rule by the courts appear to be couched in more careful terms than its earlier expositions, as if designed to confine its application within narrower limits; especially where /the injury involves a question of contributory negligence.
Thus in Mackey, administrator, vs. B. & P. R. R. Co., 19 District of Columbia, 291, the court said
“The court was correct in its refusal to direct a verdict *352 for the defendant at the close of the testimony on both sides. . . . There should be evidence adduced establishing contributory negligence on the part of the plaintiff, in relation to which fair-minded men could not draw different inferences, to' justify the court under this defence, to. withdraw the facts from the consideration of the jury.”
So in 17 Wallace, 661, Railroad Company vs. Stout:
“ If upon any construction which the jury was authorized to put upon the evidence, or by any inferences 'they were authorized to draw from it, the conclusion of negligence can be justified, the defendant was not entitled to this order.” The most recent enunciation of the rule by the Supreme Court of the United States is contaiqed in the careful opinion of Mr. Justice Lamar, in Grand Trunk Railway Company vs. Ives, 144 U. S. On page 417, the court says:
“ There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms ‘ ordinary care,’ ‘ reasonable prudence,’ and such like terms as applied'to the conduct and affairs of men have a relative significance, and cannot be' arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the s&me conclusion from them, that the question of negligence is ever considered as one of law for the court.”
*353 On page 428 the judge thus discusses another phase of the subject, and says:
“It is earnestly insisted that, ... as the evidence in the case given by the plaintiff’s own witnesses shows that the deceased himself was so negligent in the premises that but for such contributory negligence on his part the accident would not have happened; . . . the court below should, as a matter of law, have so determined, and it not having done so, this court should so declare, and reverse its judgment. To this argument several answers might be given, but the main reason why it is unsound is this: as the question of negligence on the part of the defendant was one of fact for the jury to determine, under all the circumstances of the case, and under proper instructions from the court, so, also, the question of whether there was negligence in the deceased which' was the proximate cause of the injury, was likewise a question of fact for the jury to determine, under like rules. The determination of what was such contributory negligence on the part of the deceased as would defealt this action, or, perhaps, more accurately speaking, the question of whether the deceased, at the time of the fatal accident, was, under all the circumstances of the case, in the exercise of such due care and diligence as would be expected of a reasonably prudent and careful person under similar circumstances, was no more a question of law for the court than was the question of negligence on the part of the defendant. There is no more of an absolute standard of ordinary care and diligence in the one instance than in the other.” Finally, on page 433, the learned Justice considers an instruction which was refused by the court below: “ The reason given by the court for refusing this request was that ‘ It is too much upon the weight of the evidence and confines the jury to the particular circumstances narrated, without notice of others that they may think important.’ This reason is a sound one. In determining whether the deceased was guilty of contributory negligence, the jury were bound to consider all the facts and circumstances bear *354 ing upon that question, and not select one particular prominent fact or circumstance as controlling- the case to the exclusion of all the others.”
As no particular ground was assigned, either in the motion of the defendant, or in the order of the court for its action in the case before us, we may well assume the statement of defendant’s counsel as correct, that the court gave the direction “ on the ground that the facts relied on by the plaintiff and admitted to be true as stated, disclosed that want of ordinary care and caution on the part of the plaintiff which constitutes contributory negligence as matter of law, and defeats a recovery.” It is, therefore, our duty to decide whether the testimony, upon any construction the jury was authorized to put upon it, or to draw from it, so established the plaintiff’s contributory negligence that fair-minded men could not draw a different inference from it, or, as stated in the case last referred to, “ that all reasonable men must draw the same conclusion from it.”
Without going back to the conversation on the platform of the car from which the plaintiff jumped, it was in proof to the jury that the plaintiff addressed himself soon after the train got under, way to a person who came out of the car to the platform, and asked him whether that car was going to Gaithersburg. He might well have made the inquiry, as he had received contradictory information from the two officials to whom he had already spoken on the subject. He had what one of the cases calls a strong obligation to return to his work in Gaithersburg, as his absence might lose him his place. He received the reply already quoted: “ No, it is going to Baltimore; if you don’t want to go to Baltimore, you had better get off.” The speaker was an employee of the railroad, in its uniform, whom the plaintiff, himself a railroad man, swears he took to be the conductor. There is no evidence to the contrary, and a remark of the 'defendant’s counsel on cross-examination in reply to the plaintiff’s statement that the conductor, too, thought it was safe for him to get off — “ Never mind what he thought. He *355 will be here to speak for himself” — appears to be a confession that such was his position. There seems to have been as much evidence that he was the conductor,' as there was that the person from whom the plaintiff bought the ticket, and the person who stood at the entrance gate, and the other who was engaged in the car plaintiff first entered, were in its employment. They were all acting as if they were employees. The company cannot speak for itself. It is impersonal, and must speak and act by agents, who, within the scope of their allotted duties, can bind the company by their statements.
In Dye vs. Va. Mid. R’y Co., 20 D. C., 63, this court affirmed the instruction given by the court below, that statements made by a ticket seller in Washington to a passenger purchasing a ticket, that he would go through on that ticket without change of cars, would bind tire company ; and the General Term went further than the trial justice, holding that it was the passenger’s duty to have hearkened to a statement made subsequently by the conductor near Charlottesville, that certain passengers must change cars at that place.
In Baltimore & Ohio Railroad Company vs. Kane, 69 Md., 11, it was held that where a person wearing the uniform of the railroad company, and supposed to be an official, directed the plaintiff to enter a train that stood away from the platform, and she was injured in attempting to enter the train as directed, the railroad company was answerable; and that when such person told a passenger, “we have telegraphed for an extra train,” and invited him to enter a shed, and when the train arrived at a place other than the platform, directed him to go and take it, these facts were sufficient prima facie evidence that such person was what he professed to be.
It has been contended that the reply to the plaintiff’s question could not be construed as an advice to alight then and there; but must naturally be held to mean that he should get off at Baltimore or at some intervening station. *356 We cannot accept this view of his intended meaning. It might almost as well be said that the advice to get off should be understood to be a direction not to get off at all. To tell him if he did not want to go to Baltimore, he must get off at Baltimore, would be rather an extraordinary suggestion; and there is nothing to show that the train was to stop at all before it should reach Baltimore. Its natural meaning seems to have been understood correctly by the plaintiff. He saw the train was moving slowly, not faster than the walk of a nimble pedestrian. He must have known that as it got clear of the interlacing tracks and rows of cars that cluster near a depot, the speed would be greatly accelerated and that the train would soon approach that point, and that if he did not accept the suggestion promptly his chance of leaving the train would be altogether lost. He swears he himself thought he could jump off in safety, and he supposed the conductor thought so too. There is nothing to show the conductor moved from the spot. If he thought it unsafe, it would have been a savage act to allow the plaintiff to make the jump, without trying to dissuade him; but there was no word or act in that direction; and the plaintiff made the jump, as he believed, in the proper -yvay, in the direction of the moving train. Had the condition of affairs which existed when the conductor advised him to jump remained unchanged for a few seconds longer, there would probably have been no injury; but the plaintiff accounts for it by saying: “The best of my recollection is, as I stepped off the engineer gave the engine a little more steam, and threw me off my balance.” The engineer who thus increased the rate of speed was another employee of the defendant, and his act also was that of the defendant. The result was precisely what appeared in the case of Washington & Georgetown R. R. Co. vs. Harmon, 147 U. S., 571, where the plaintiff, a man advanced in life, signalled the conductor to stop a street car. The car nearly came to a stop, and Harmon was in the act of alighting, when the conductor jerked the cord; the car started sud *357 denly at a greater speed, and he was thrown to the pavement and injured.
'Such was the state of facts in Baltimore & Ohio R. R. Co. vs. Kane, 69 Maryland, already referred to, where the defendant railroad insisted the plaintiff attempted to board a train of cars while in motion, and the plaintiff testified he was thrown off by a sudden jerk of the train; and in 74 Maryland, 212, Central Railway Company vs. Smith, where the plaintiff was injured by being thrown to the ground by the starting of the car.
If the supposed conductor, at the instant he gave the advice to the plaintiff in this case, had pulled the cord and thereby so increased the speed to the dangerous degree, the connection of the defendant with the result might appear more intimate; but the intervening distance at which the engineer stood could not alter the fact that one agent of the defendant was altering the conditions so as to make the jump a perilous one, at the moment another agent was practically advising him it would be safe for him to make it.
It is no longer a controverted point that the mere act of jumping from a car in motion, not at a high speed, does not in itself constitute contributory negligence in law. In 61 st Maryland, 60, Cumberland Valley Railroad Company vs. Maugans, where the plaintiff, knowing the train was in motion, stepped from it, haying at the time in his right hand a valise, which with its contents weighed from 15 to 20 pounds, and a basket of provisions weighing from 8 to 12 pounds on his left arm, while the train was moving slowly, and was severely injured, the lamented Judge Miller, in the course of a very able opinion, uses this language:
“We agree that while the question of negligence is ordinarily one of fact and not of law, cases do> occur (and perhaps the number of such cases is increasing) in which it becomes the duty of the court to interpose and withdraw it from the consideration of the jury. The case, however, must be a very clear one to justify a court in taking upon itself this responsibility. It must present some prominent *358 and decisive act in regard to the effect and character of which' no room is left for ordinary minds to differ. Accidents occur 'and injuries are inflicted under an almost infinite variety of circumstances, and it is quite impossible for the courts to fix the standard of duty and conduct by a general and inflexible rule, applicable to all cases, so that a departure from it can be pronounced negligence in law. The rule that requires a party before he crosses a railroad track to stop, look and listen for approaching trains, which has been generally adopted by the courts, is the only one that approaches universality of application in reference to a particular class of accidents. But there is no such general accord of judicial opinion and precedent in reference to attempts to leave a car while it is in motion. The cases cited in the briefs of counsel on both sides show very clearly that the weight of authority is against the proposition that it is always, as matter of law, negligence and want of ordinary care, for a person to attempt to get off from a car when it is in motion. ... At all events, we are clearly of opinion that, whether there was negligence or want of ordinary care in the conduct and acts of the plaintiff, under all the circumstances of this case, is a question in regard to which reasonable men may honestly entertain different views.”
Again, quoting from a Michigan case, he says:
“ ‘ When the question arises upon a state of facts on which' reasonable men may fairly arrive at different conclusions, the fact of negligence cannot be determined until one or the other of these conclusions has been drawn by the jury. The inferences to be drawn from the evidence must either be certain and incontrovertible, or they cannot he decided upon by the court. Negligence cannot be conclusively established by a state of facts upon which' fair-minded men may well differ.’ ”
In a more recent case decided in June, 1890, reported in 72 Maryland, 519, P. W. & B. R. R. Co. vs. Anderson, a passenger leaving Philadelphia for Chester at night, hear *359 ing the name of his station called and supposing the train had arrived at the depot, got on the car platform; the train started again slowly, and thinking the train was leaving the depot, and not wishing to be carried to the next station, he stepped off on the south instead of the north side of the road and without looking for approaching trains, and. was instantly knocked down by a train going north. It appeared the train from Philadelphia had not yet reached the depot when the name of the station was called, but had stopped to await the passing of the north-bound train, and that no notice was given that the train had not reached the depot, nor were the passengers told to keep their seats. Upon the whole evidence, the defendant asked for an instruction that the plaintiff had been so guilty of contributory negligence in his manner of leaving the car as to dis-entitle him to recover. This prayer was refused by the court below and the jury found a verdict for the plaintiff. On appeal, after full statement and discussion of the law, the Court of 'Appeals declared: “We do not see how we can hold as matter of law that the plaintiff was, guilty of contributory negligence because he did not look out for the approaching train before he left the car in which he was travelling. In our opinion, the whole question was properly left to the jury by the instructions given at the trial.”
And yet the point ruled upon there, which' the court declined to say was negligence in law under the circumstances, was the only act of negligence which, as Judge Miller says in 6'i Maryland, approaches universality of application to this class of cases.
The most recently reported case in Maryland is Western Maryland Railroad vs. Herold, 74 Maryland, 510, decided in 1891. There the plaintiff had gone on a car with her children to a sanitarium near Baltimore city. When the train was about to return, in order to secure a seat, against the rules of the establishment she entered a car standing at some distance from the platform and before the car was prepared to receive passengers. After she was seated, a *360 boy loosened the brake attached to the car which caused it to descend rapidly towards the platform by its own gravity, without any person in charge. The plaintiff became frightened, and following the example of others therein, jumped off and was injured. It was held that neither of these acts, nor all taken together, would justify the court to say, as matter of law, that the plaintiff was guilty of contributory negligence; that' it was for the jury to decide whether the circumstances were such as to justify a prudent person in jumping from the, car.
And this seems to be the rational rule to apply to each case as it arises. An act which might be of decided danger if performed by an invalid person, or by. a woman encumbered by her skirts, might be quite a safe one if done by an athletic man in the vigor of youth. It is every day’s experience that scores of people get off and on the street cars, while in motion, without injury, although every such act involves hazard of injury. In Harmon’s case, the street car conductor testified that the plaintiff, though an old man, was in the habit of riding on the car and getting off while it was in motion. To say that what is done daily all over the country, though' certainly unwise and to be condemned, is necessarily dangerous to the point of being contributory negligence per se, seems too much against. human experience to be a reasonable judgment.
We know, furthermore, that brakemen on trains in rapid motion even move along the top of cars and jump from one to another in safety. Every person has seen, particularly on northern railroads, two upright posts with cross-beams supporting a fringe of leather strips hanging down from the cross-pieces, which are arranged on each side of the bridges, to come in contact with the brakemen on top of the cars at night, who might otherwise forget their proximity to the bridge; and thus give them warning of the danger.
It is said by defendant’s counsel, that cases like that in 61 Maryland, are not applicable to the case at bar, because in that class of cases the party was attempting to aligh't at *361 a regular station where the company was charged with a duty to deposit the passengers safely; whereas-no such duty exists to set down a passenger between stations. But this consideration does not affect the question there considered, as to the negligence said to be implied from an attempt to leave a train in motion.
But we are not at all prepared to decide that a railway company has no duty to perform, under all circumstances, in landing a passenger between stations. If a passenger had been found to be traveling without a ticket and had refused to pay his fare, or if he had been riotous or disorderly on the train, the officials would not have hesitated to stop entirely and eject him, notwithstanding the supposed urgent necessity of saving a few minutes. And where it appeared that a passenger (and it might equally happen to a score of them) by misinstruction of the company’s agents, had gotten on the train by mistake, there could be no propriety or right in keeping them virtually prisoners until the arrival of the train at a point, perhaps sixty miles distant from the destination to which 'they had contracted to carry them in safety. Such delay might cause the passenger to lose his passage to Europe to his serious pecuniary loss; or delay the traveler from reaching in time the bedside of a dying friend; or, as in the case at bar, prevent his return to his work at a proper time. Could it be possible that if a passenger from Washington should be found to’ have died just after leaving the depot, his mourning wife with the corpse must necessarily be carried to Baltimore, instead of being allowed to return at once to her desolate home?
The plaintiff’s reason for not asking the conductor to stop is answered by the prompt suggestion made to him by the conductor to do what, it seemed to him, and as he testified to the official also believed was a safe act, considering the slow rate of the train when he spoke and the physical vigor of the plaintiff; who, as we have seen was shown to have been a railroad agent for three years, and to have gotten off of trains in motion, (as the question and answers imply), though he denies he was in the habit of doing so.
*362 In Pittsburgh, Cincinnati & St. Louis R. R. Co. vs. Krouse, 30 Ohio St., 222, where the plaintiff, professing to be acting under the advice of the conductor, immediately jumped from the train moving at the rate of four or five miles an hour at a place not intended, for passengers to alight, it did not appear the plaintiff acted differently from what would have been his action without the remark of the conductor; nor that he requested the train to be stopped or slacked to enable him to get off in safety. But the court held that all the circumstances, including those last named, were properly left to the jury, upon the question of contributory negligence.
It is perfectly settled that as the burden of proving contributory negligence rests upon the defendant, it must be established by a preponderance of evidence. R. R. Co. vs. Mares, 123 U. S., 721. Although the fact may be equally proved by the testimony of a plaintiff himself, yet we cannot in the case before us say that in the judgment of reasonable men such negligence was so established by the testimony for the plaintiff at this trial as to justify the court in declaring it was sufficient, as matter of law, to defeat a recovery. Two juries are shown h> have rendered verdicts inconsistent with such a conclusion upon what seems to have been substantially the same testimony for the plaintiff; and this court in General Term, on the second appeal, used language tending to imply that the facts testified to were not such “ that all reasonable men must draw the same conclusions from them,” and that the question was one “ in regard to which reasonable men may not entertain different views.”
We are only to be understood as deciding on this point, that the evidence offered in behalf of the plaintiff was not of the character to justify the court’s order in withdrawing the case from the jury. Beyond that we are not called upon to give any opinion, and abstain from doing so.
The judgment below is reversed, and the cause remanded for a new trial, where the evidence on both sides can be compared and passed upon by the jury.